IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 14, 2007

## RONALD EUGENE HALL v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2001-D-1974    Cheryl Blackburn, Judge**

---

**No.   M2006-02726-CCA-R3-PC - Filed May 29, 2008**

---

Petitioner, Ronald Eugene Hall, was convicted by a Davidson County Jury of two counts of second degree murder. The convictions were merged into a single count of second degree murder, for which Petitioner received a twenty-year sentence to be served at one-hundred percent incarceration. On direct appeal, this Court affirmed Petitioner's conviction and sentence. *See State v. Ronald Eugene Hall*, M2003-02326-CCA-R3-CD, 2005 WL 292432, at *16 (Tenn. Crim. App., at Nashville, Feb. 8, 2005). Petitioner then sought post-conviction relief. After an evidentiary hearing, the post-conviction court denied relief. Petitioner appeals the judgment of the post-conviction court. We affirm the judgment of the post-conviction court because Petitioner has failed to establish that he received ineffective assistance of counsel or that he was incompetent to stand trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID H. WELLES, and JOHN EVERETT WILLIAMS, JJ., joined.

Jeremy W. Parham, Nashville,Tennessee, for the appellant, Ronald Eugene Hall.

Robert E. Cooper, Jr., Attorney General & Reporter; Clarence E. Lutz, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Bret Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Factual Background

On October 19, 2001, Petitioner and Henry Lee Dixon were indicted by the Davidson County Grand Jury for first degree felony murder, first degree premeditated murder, and attempted especially

aggravated robbery in connection with the death of Marcus Scott. Linda Dawn Provost was indicted for first degree felony murder and attempted especially aggravated robbery in the same indictment. According to this Court's opinion on direct appeal, the following facts were elicited through testimony at trial:

Marcus Scott was the victim of a homicide in this case. Samuel Scott, Jr., said that he knew his son, Marcus Scott, was dating Linda Provost. However, Samuel Scott, Jr. had not met the young woman. Mr. Scott said his son left their apartment after he received a telephone call around 10:18 p.m. on July 20, 2001. Approximately five minutes later, Mr. Scott heard four successive shots. Mr. Scott said that his son did not own a gun.

Shaquita Brooks said that she had seen Marcus Scott a couple of times with Ms. Provost and knew the couple was dating. Ms. Provost told her that Mr. Scott had hit her during one of their dates. Ms. Brooks was aware that Defendant Hall had previously dated Ms. Provost, but she had never met him.

Ms. Brooks said that Ms. Provost picked her up around 8:30 p.m. on July 20, and the two women drove to Percy Priest Lake to see one of Ms. Provost's friends. While the women were at the lake, Defendant Hall called Ms. Provost and asked if he could see her. Ms. Provost and Ms. Brooks then drove to the Kroger parking lot on Gallatin Road to meet Defendant Hall.

After they arrived at the parking lot, Ms. Provost got out of the car and hugged Defendant Hall. Ms. Provost and Defendant Hall then began discussing how to lure Mr. Scott out of his apartment. Both agreed that Ms. Provost would call Mr. Scott and ask him to meet her at her car. Ms. Provost wanted Defendant Hall to accost Mr. Scott before he got into her car. Defendant Hall wanted to wait until Mr. Scott was inside the car and then drag him back out of the car onto the sidewalk. Ms. Brooks said that she did not know what Defendant Hall intended to do after he confronted Mr. Scott.

Defendant Hall used Ms. Provost's cell phone, and Ms. Brooks heard Defendant Hall say that Ms. Provost did not want to go through with "their" plan. Defendant Dixon then walked up and joined Ms. Provost's and Defendant Hall's discussion about the best way to confront the victim. Ms. Provost told the men to get in her car so she could show them the bushes behind Kroger where they could hide before grabbing Mr. Scott. Ms. Brooks said that Mr. Scott's apartment building was across the street from the bushy area. Defendant Hall and Defendant Dixon got out of Ms. Provost's car in front of Mr. Scott's apartment building and said they would call Ms. Provost in ten minutes.

After a few minutes, Defendant Hall and Defendant Dixon walked back to the parking lot. Defendant Dixon told Ms. Provost that her plan would not work because there were too many people about. Defendant Dixon said he and Defendant Hall would pretend to steal Ms. Provost's purse. Defendant Dixon told Ms. Provost that there were not any bullets in "the gun." Defendant Hall asked Ms. Provost if Mr. Scott had any money, and Ms. Provost said that the victim always carried cash with him. In order to scare Ms. Provost into abandoning the plan, Ms. Brooks warned the group that the victim might be armed. Ms. Brooks said that either Defendant Hall or Defendant Dixon replied that the victim would not have time to use a gun because they "would be on him." Ms. Brooks said that Defendant Dixon was the first one to mention that he and Defendant Hall had a gun. On cross-examination, Ms. Brooks said that Defendant Dixon was not armed.

Ms. Brooks argued with Ms. Provost and got in Defendant Dixon's car. She and the two men drove to the victim's apartment building. The men got out, and Ms. Brooks drove Defendant Dixon's car back to the Kroger parking lot. Shortly thereafter, Mr. Dixon came running up to the car, nervous and upset. Ms. Brooks then heard about three gunshots. Mr. Dixon told her that he thought "he shot him." A few seconds later, Defendant Hall got in the car, and said that "he didn't have any money on him." The trio left the parking lot. Defendant Dixon let Ms. Brooks out at the H.G. Hill's store across the street, and the two men drove away. Ms. Brooks tried to telephone Ms. Provost once, but did not reach her.

Ms. Brooks was later recalled as a witness by the defense and admitted that she had not told the police that Defendant Hall said anything when he returned to the car after the shooting.

Cynthia Human lived behind Kroger. On the evening of July 20, she heard three or four gunshots. Ms. Human looked out the window and saw the rear end of an automobile in the Kroger parking lot. The car drove away two or three minutes after the gunshots. Ms. Human did not see anyone either outside or inside the car.

Officer Gary Poteet arrived at the scene at 10:30 p.m. Ms. Provost was lying in the street, wounded. Marcus Scott, who had also been shot, was in the front passenger seat of a green vehicle. The seat was in a reclined position. Officer Poteet said that Ms. Provost told him that she did not know who shot her because the shooter wore a ski mask.

Officer Johnny Lawrence retrieved two projectiles from the seat in which Mr. Scott had been sitting and two projectile fragments from the driver's seat. Officer Lawrence did not find any shell casings at the scene. Officer Daniel Orr examined the vehicle at the police station and found a shell casing in the rear floor board behind

the passenger seat. Officer Lorita Marsh matched both Defendants' fingerprints with fingerprints found on the car's frame and on items in the car.

Officer George Bouton photographed the scene. He inserted wooden rods through the holes made by the bullets in the passenger seat's upholstery to illustrate the bullets' path and then photographed the rods.

Dr. Thomas Deering, an assistant medical examiner for Davidson County, performed Mr. Scott's autopsy. Dr. Deering said that either three or four bullets entered Mr. Scott's body. The path of two of the bullets struck major organs and were fatal injuries. On cross-examination, Dr. Deering said that Mr. Scott also had a small laceration over his left eye that was consistent with being struck with a fist.

Linda Provost testified that she met Mr. Scott in McMinnville, Tennessee about a month before the incident. Around July 16, 2001, she accompanied Mr. Scott to his motel room because he told her there was going to be a party. No one else was in the room, and Ms. Provost attempted to leave. During a struggle, Mr. Scott struck Ms. Provost in the face with his fist.

Ms. Provost had dated Defendant Hall when they were in high school. Shortly before the shooting, Defendant Hall began calling Ms. Provost again in an attempt to resume their relationship. Defendant Hall called Ms. Provost on the night of her altercation with Mr. Scott, and Ms. Provost told Defendant Hall about the incident because she was upset. Ms. Provost said Defendant Hall said that he would "take care of it."

Ms. Provost said that she arranged to meet Defendant Hall at the Kroger parking lot on July 20. When she arrived, Defendant Hall told her that "he had it planned out." Ms. Provost said that she was supposed to park in front of the victim's apartment building, call the victim on her cell phone, and ask him to come out and see her. Once the victim was in the car, Defendant Hall said he and Defendant Dixon would stage a robbery and drag Mr. Scott out of the car. Ms. Provost said that neither Defendant Dixon nor Defendant Hall told her what they planned to do when they got the victim out of the car, but she assumed they were going to beat up Mr. Scott. Ms. Provost said that there was never any mention of shooting or robbing the victim, other than a staged robbery. Ms. Provost said that she met Defendant Dixon for the first time that night.

Ms. Provost said that she drove to the victim's apartment building as planned, and Mr. Scott came out to her car. He got in the passenger seat, and Ms. Provost heard a noise outside the open passenger side window. Ms. Provost said she was shot and then heard two more gunshots. Ms. Provost saw Defendant Hall fire the

-4-

shots. She got out of her car and saw Defendant Hall run toward the Kroger parking lot. Ms. Provost called 911 with her cell phone.

On cross-examination, Ms. Provost said that Defendant Dixon was not with Defendant Hall when the shooting occurred. She admitted she lied to the police when she told them the shooter wore a ski mask.

The State introduced the phone logs [of] Ms. Provost's cell phone reflecting the telephone calls that were made on the night of the shooting. At 9:32 p.m., Ms. Provost's cell phone was used to place a call to Mr. Scott. A second phone call to the victim was made at 10:18 p.m. A 911 call was made from Ms. Provost's cell phone at 10:24 p.m.

Defendant Dixon testified that Defendant Hall came by his apartment around 8:14 p.m. on July 20. Defendant Hall asked him to go with him and meet Ms. Provost and her friend. Defendant Dixon said that his date for the evening was delayed so he agreed to accompany Defendant Hall. When they arrived at the Kroger parking lot, Defendant Dixon let Defendant Hall out of the car and found a parking place. He said that he and Ms. Brooks chatted, and he did not hear what Defendant Hall and Ms. Provost were talking about. Defendant Hall called him on his cell phone and told him about the altercation between Ms. Provost and the victim. Defendant Hall asked him to come over to Ms. Provost's car so they could discuss a plan of action. Defendant Dixon said that neither he nor Ms. Brooks wanted to get involved, and Defendant Dixon kept trying to leave. Defendant Hall told him to wait until he calmed down Ms. Provost. Defendant Dixon said that he walked over to the bushes at the back of the Kroger parking lot in order to relieve himself.

Ms. Provost drove out of the parking lot, and Defendant Hall told Defendant Dixon he was going with her. Defendant Dixon said he walked back to his car and was starting to leave when he heard gunshots. Defendant Dixon pulled his car out of the parking lot and saw Defendant Hall. Defendant Hall jumped into his car, and Defendant Dixon said he let both Defendant Hall and Ms. Brooks out at the H.G. Hill's across the street. Defendant Dixon said that he drove away at that point. Defendant Dixon denied that he helped plan either an assault or a robbery on the victim.

On cross-examination, Defendant Dixon admitted that his testimony in court was different from his two prior statements made to the police. Defendant Dixon said that he occasionally advised Defendant Hall who was eighteen or nineteen at the time of the incident, and had helped Defendant Hall find a job. Defendant Dixon admitted that Defendant Hall had asked him what to do about Ms. Provost getting hit by Mr. Scott on a couple of occasions prior to the shooting. Defendant Dixon said

that he knew Defendant Hall and Ms. Provost wanted to do something to the victim, but he denied that either one of them had mentioned robbing or shooting the victim.

*Ronald Eugene Hall*, 2005 WL 292432, at *1-4.

At the conclusion of the jury trial, Petitioner was found guilty of two counts of second degree murder and not guilty of attempted especially aggravated robbery. The trial court merged Petitioner's conviction for second degree murder under count two with his second degree murder conviction in count one and sentenced him to twenty years. Petitioner's conviction was affirmed on direct appeal. *See id.* at *16.

Subsequently, Petitioner filed a pro se petition for post-conviction relief. In that petition, Petitioner argued that he received ineffective assistance of counsel and that it was questionable whether he was actually competent to stand trial. The post-conviction court appointed counsel to represent Petitioner, and an amended petition for post-conviction relief was filed. In the amended petition, Petitioner argued that his conviction violated the Fourteenth Amendment to the United States Constitution and Article I, Section 8 of the Tennessee Constitution because Petitioner "did not receive medication necessary to preserve his mental competence during trial" and that he received ineffective assistance of counsel at trial because trial counsel: (1) failed to monitor Petitioner's intake of prescribed medications; (2) failed to investigate and call witnesses on Petitioner's behalf; and (3) failed to advise Petitioner properly as to whether he should testify at trial.

*Evidence at the Post-conviction Hearing*

At the post-conviction hearing, Petitioner testified that he was presently incarcerated at the Deberry Special Needs Facility. He admitted that he was diagnosed as a schizophrenic but disagreed with that assessment. Petitioner stated that he was given Tegretol, Wellbutrin, Haldol and Cogentin to control his mental problems. Petitioner informed the trial court that he stopped taking the Tegretol and Wellbutrin at some point. Prior to trial, Petitioner was sent for a mental evaluation and prescribed medication. Petitioner testified that he "stopped taking [the medication] previous [sic] to going to trial," but could not remember for how long. Petitioner stated that neither of his trial attorneys asked him if he was properly taking his medication. They merely informed him that an insanity defense "wouldn't work."

Petitioner stated that he "understood what was going on" during the trial. However, Petitioner claimed that he wanted to testify, but was told that counsel for the State "would make [him] look stupid." Petitioner claimed that if he had testified, he would have made the jury understand that he "ain't [sic] shoot nobody [sic]." Petitioner proceeded to tell the post-conviction court a version of the events in which he claimed that he was not even present when the victim was killed. Petitioner admitted that he "conversated" with trial counsel about this version of the events but stated that his trial counsel told him that the story was "unbelievable." Petitioner admitted that it was his signature on the written waiver of his right to testify, but he denied knowing the substance or content of the form and did not remember signing it at trial. Petitioner testified that trial counsel

-6-

encouraged him to plead guilty and take the plea offer prior to trial. Petitioner declined the offer.

Dr. Rokeya Farooque, a forensic psychiatrist from the Middle Tennessee Mental Health Institute ("MTMHI"), testified that she saw Petitioner several times prior to trial. She evaluated Petitioner five months prior to his trial. She read from Petitioner's medical records that detailed several admissions to MTMHI for evaluation after occurrences at the jail. The records indicated that Petitioner had been diagnosed with paranoid schizophrenia and attention deficit hyperactivity disorder. Petitioner's most recent admission, in December of 2002, occurred after Petitioner attempted to cut his wrist. During that admission, Petitioner was treated with Depakote, Haldol D and Trazodone. Haldol is an antipsychotic medication. Depakote is used for mood stabilization and was used in Petitioner's case to control violent behavior. Trazodone is an antidepressant medication that can also be used as a sleeping aid. Dr. Farooque admitted that she did not complete a competency evaluation at that time. Dr. Farooque described some of the medication that was prescribed for Petitioner. According to the doctor, Petitioner received Haldol in the form of a monthly injection. Dr. Farooque testified that even if Petitioner stopped receiving the injections, the medication would take time to dissipate from his body. Dr. Farooque testified that she did not specifically evaluate Petitioner for competence prior to his trial.

The post-conviction court also heard testimony from Petitioner's trial counsels. Both of the attorneys that represented Petitioner testified that Petitioner seemed engaged in his defense, offering possible defense theories prior to trial. One of the attorneys testified that he engaged in mock cross-examination with Petitioner prior to trial to see how Petitioner would answer when subjected to questioning. In counsel's opinion, the exercise indicated that testimony by Petitioner would be unsuccessful at trial. Trial counsel admitted that he did not ascertain whether Petitioner was taking his medication prior to trial and did not consult with any of Petitioner's doctors prior to trial. The other trial attorney stated that Petitioner gave him no reason to question Petitioner's competence.

At the conclusion of the hearing, the post-conviction court took the matter under advisement. Later, in a written order, the trial court determined that Petitioner: (1) "failed to meet his burden of showing by clear and convincing evidence that he was not competent to stand trial or that his trial counsel was ineffective for failing to monitor his mental health and medications;" (2) failed to establish that he was prejudiced by trial counsel's failure to interview and investigate a potential witness; and (3) failed to demonstrate that he received ineffective assistance of counsel with regard to his decision to testify at trial. As a result, the post-conviction court dismissed the petition. Petitioner filed a timely notice of appeal.

*Analysis*
*Post-Conviction Standard of Review*

The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. *See State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). During our review of the issues raised, we will afford those findings of fact the weight of a jury verdict, and this Court

is bound by the post-conviction court's findings unless the evidence in the record preponderates against those findings. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *Alley v. State*, 958 S.W.2d 138, 147 (Tenn. Crim. App. 1997). This Court may not reweigh or re-evaluate the evidence, nor substitute its inferences for those drawn by the post-conviction court. *See State v. Honeycutt*, 54 S.W.3d 762, 766 (Tenn. 2001). However, the post-conviction court's conclusions of law are reviewed under a purely de novo standard with no presumption of correctness. *See Shields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

*Competence*

Petitioner alleges on appeal that his conviction is void because he was not competent to stand trial and did not receive the proper medications prior to trial that were "necessary to preserve his mental competence during trial." Specifically, Petitioner claims that his conviction is invalid and should be "overturned due to his failure to receive medications necessary to maintain competency." The State counters that this issue is "barred" from being heard in a post-conviction proceeding because the issue was previously determined in the trial court and waived because it was not addressed on direct appeal. Further, the State argues, Petitioner has failed to present proof that he was incompetent to stand trial.

As noted by the State, this issue was not presented in Petitioner's direct appeal from his conviction. In a post-conviction proceeding, "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless" the claim is based upon a newly-recognized constitutional right with retroactive application or the ground was not presented as the result of state action in violation of the federal or state constitution. T.C.A. § 40-30-106(g); *see State v. Benson*, 973 S.W.2d 202, 208 (Tenn. Crim. App. 1998).

At the post-conviction hearing, both attorneys for Petitioner testified that the trial court determined that Petitioner was competent to stand trial. Petitioner did not challenge the determination of competency on appeal. There was no testimony at the post-conviction hearing as to why Petitioner did not bring the issue on appeal. The issue is not a newly-recognized constitutional right with retroactive application, and there was no evidence adduced at the post-conviction hearing that the ground was not presented as a result of state action. Therefore, this issue is waived. Moreover, Petitioner has failed to present clear and convincing proof that he was incompetent to stand trial. In fact, the evidence admitted at the post-conviction hearing actually supported the conclusion that Petitioner was competent to stand trial. Both trial attorneys testified that Petitioner was actively involved in his defense, and Dr Farooque testified that at Petitioner's last assessment in December of 2002, only five months prior to trial, Petitioner appeared to be competent.

*Ineffective Assistance of Counsel*

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, the petitioner bears the burden of showing that (a) the services rendered by trial counsel were deficient and (b) that the deficient performance was prejudicial. *See Powers v. State*, 942 S.W.2d 551, 558 (Tenn. Crim. App. 1996). In order to demonstrate deficient performance, the petitioner must show that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In order to demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997).

As noted above, this Court will afford the post-conviction court's factual findings a presumption of correctness, rendering them conclusive on appeal unless the record preponderates against the court's findings. *See id.* at 578. However, our supreme court has "determined that issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact . . . ; thus, [appellate] review of [these issues] is de novo" with no presumption of correctness. *Burns*, 6 S.W.3d at 461.

Furthermore, on claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight. *See Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. 1994). This Court may not second-guess a reasonably-based trial strategy, and we cannot grant relief based on a sound, but unsuccessful, tactical decision made during the course of the proceedings. *See id.* However, such deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case. *See Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

*Counsels' Failure to Monitor Medication and Competency*

First, Petitioner claims that both trial counsels were ineffective for failing to "monitor" whether Petitioner received his prescribed medications prior to trial. Petitioner admits that his attorneys could not have forced Petitioner to take his medication, but argues that they had a "duty" to determine whether he was taking all of his medication as ordered.

In its order denying post-conviction relief, the post-conviction court determined that the trial attorneys' testimony was credible. They both testified that Petitioner assisted with his defense and neither of them observed behavior prior to or during trial that would cause them to question Petitioner's competency. The evidence does not preponderate against the judgment of the post-conviction court. Petitioner has failed to carry his burden in this regard.

*Counsels' Failure to Advise Petitioner About Right to Testify at Trial*

Next, Petitioner argues that trial counsels provided Petitioner with ineffective assistance of counsel because they told him that he would "look stupid" on the witness stand when Petitioner clearly desired to testify in his own behalf.

In its motion denying the petition for post-conviction relief, the post-conviction court again found the testimony received by both trial counsels to be credible. At the hearing, trial counsels both testified that they spoke with Petitioner about the decision to testify. Petitioner himself admitted that he made the decision not to testify after meeting with trial counsel. Further, Petitioner admitted that he executed a waiver of his right to testify. The evidence does not preponderate against the judgment of the post-conviction court. Petitioner has failed to carry his burden in this regard.

*Cumulative Effect of Counsel's Errors*

Finally, Petitioner argues that the cumulative effect of trial counsels' errors is sufficient to warrant a new trial. We have determined that Petitioner did not receive ineffective assistance of counsel. Accordingly, this issue is without merit.

*Conclusion*

For the foregoing reasons, the judgment of the post-conviction court is affirmed.

_____
JERRY L. SMITH, JUDGE